# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lake Naomi Club, Inc. and Pocono  :
Pines Community Association, Inc.,  :
           Appellants     :
                              :
        v.              :   No. 1164 C.D. 2021
                              :
Eric Rosado and Alice Quinones  :   Argued: September 14, 2022

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE LORI A. DUMAS, Judge

OPINION BY JUDGE CEISLER           FILED: October 28, 2022

      Lake Naomi Club, Inc. and Pocono Pines Community Association, Inc. (together, Associations)[1] appeal from the September 14, 2021 Order of the Court of Common Pleas of Monroe County (Trial Court) denying their Post-Trial Motion. Following a non-jury trial, the Trial Court entered judgment in favor of Eric Rosado and Alice Quinones[2] and denied the Associations' request for injunctive relief.

      This appeal involves an issue of first impression in Pennsylvania: Can a private, planned community adopt a restrictive covenant that prohibits lifetime

---

[1] Although Lake Naomi Club, Inc. and Pocono Pines Community Association, Inc. are distinct entities, as discussed in the Background section of this Opinion, we refer to Appellants together as "Associations," unless we are discussing an action by only one entity.

[2] Mr. Rosado and Ms. Quinones were married when they purchased a home in the Lake Naomi community in 1998 but have since divorced. Ms. Quinones no longer resides at the Lake Naomi property and has not actively participated in this case. On July 11, 2022, this Court entered an Order precluding Ms. Quinones from filing a brief and participating in oral argument.

registered sex offenders from residing within that community? To date, no Pennsylvania appellate court has considered this issue. For the reasons that follow, we conclude that a private community may not adopt such a covenant, and, therefore, we affirm the Trial Court's Order.

## Background

### 1. Covenant 14

Lake Naomi is a private, planned community in Tobyhanna Township, Monroe County, that is governed by the Uniform Planned Community Act (UPCA), 68 Pa. C.S. §§ 5101-5414. Pocono Pines Community Association (Pocono Pines) is a nonprofit corporation that serves as the homeowners' association for all deeded property owners in the Lake Naomi community, and all deeded owners of property in Lake Naomi are Pocono Pines members. Lake Naomi Club, Inc. (LNC) is a nonprofit corporation and the deeded owner of all common areas and amenities within the community. By operation of a July 11, 1988 deed from Pocono Pines to LNC, LNC has the right to enforce Pocono Pines' Declaration and Covenants and to control the common areas and amenities within Lake Naomi.

At Pocono Pines' 2013 annual meeting, some residents raised concerns about a sex offender who was living in Lake Naomi. As a result of these concerns, on March 30, 2016, Pocono Pines adopted a restrictive covenant (Covenant 14) amending its Declaration. Covenant 14 provides that no registered Tier III sex offender "shall occupy or reside in any [l]ot, dwelling, or common area within the boundaries of" the Lake Naomi community and "[n]o [unit o]wner or agent of an owner shall knowingly allow such a [p]rohibited person to occupy or reside in" the community. Reproduced Record (R.R.) at 955a. The amendment was recorded on May 11, 2016.

2

Prior to adopting the amendment, Pocono Pines sent written ballots regarding the amendment to all members, including Mr. Rosado, and more than two-thirds of the members approved the amendment. The evidence at trial showed that 94% of those who returned ballots, comprising 71% of all unit owners, approved Covenant 14.[3]

## 2. Underlying Criminal Proceedings

On June 9, 2015, a jury convicted Mr. Rosado of indecent assault, endangering the welfare of a child, corruption of minors, and unlawful contact with a minor. The convictions stemmed from offenses he committed against his then-seven-year-old step-granddaughter in his Lake Naomi home. The Trial Court sentenced Mr. Rosado to 30 to 72 months' incarceration.

On February 10, 2016, Mr. Rosado was convicted in the State of New York of sexual conduct against a child in the second degree. The New York conviction stemmed from offenses he committed against the same step-granddaughter at his apartment in New York City during the preceding two years.

At the time of his convictions, Mr. Rosado was required to register as a Tier III sex offender for life in Pennsylvania under the Sexual Offender Registration and

---

[3] Section 5219(a)(1) of the UPCA provides:

**(a) Number of votes required.--**

(1) The declaration, including the plats and plans, may be amended only by vote or agreement of unit owners of units to which at least:

(i) 67% of votes in the association are allocated; or

(ii) a larger percentage of the votes in the association as specified in the declaration; or

(iii) a smaller percentage of the votes in the association as specified in the declaration if all units are restricted exclusively to nonresidential use.

68 Pa. C.S. § 5219(a)(1).

Notification Act (SORNA I), which took effect on December 20, 2012. *See former* 42 Pa. C.S. §§ 9799.10-9799.41.[4] Mr. Rosado was also required to register as a Tier I sex offender in New York.

On August 23, 2018, Mr. Rosado was released on parole and moved back into his Lake Naomi home, subject to supervision by the Pennsylvania Parole Board (Parole Board). Mr. Rosado's supervision ended on September 23, 2021, during the pendency of this action.

### 3. Trial Court Proceedings

On November 7, 2018, the Associations hand-delivered a letter to Mr. Rosado informing him that, as a registered Tier III sex offender, he was in violation of Covenant 14 and requesting that he vacate his Lake Naomi property. On December 14, 2018, the Associations sent Mr. Rosado a second letter requesting that he vacate his property. Mr. Rosado refused to do so.[5]

On February 5, 2019, the Associations filed in the Trial Court a Complaint in Equity, seeking to permanently enjoin Mr. Rosado from residing at his Lake Naomi property due to his status as Tier III sex offender. After several rounds of preliminary objections, the pleadings were closed on June 2, 2020. The Trial Court held a non-jury trial on February 19, 2021, and April 8, 2021.

---

[4] In 2018, the General Assembly enacted SORNA II, Act of February 21, 2018, P.L. 27, *as amended by* the Act of June 12, 2018, P.L. 140, 42 Pa. C.S. §§ 9799.10-9799.75, which amended SORNA I and added new provisions that became effective immediately. We refer to SORNA I and SORNA II together as "SORNA" throughout the remainder of this Opinion.

[5] Mr. Rosado, who is now 73 years old, continues to reside in his Lake Naomi home. The Trial Court found that "Mr. Rosado is the only person [the Associations] have sued to evict. In one other circumstance, a Tier III sex offender leased a [Lake Naomi] home. After being contacted by the [Associations], that individual moved out of the community." Trial Ct. Op., 7/19/21, Finding of Fact (F.F.) No. 40.

4

At trial, the Associations presented the testimony of several expert witnesses, who testified regarding the recidivism rates of sex offenders and the negative impact on property values of a known sex offender living within a community. Trial Ct. Op., 7/19/21, F.F. Nos. 32-39. The Pocono Pines community manager also testified regarding the child-centered nature of the Lake Naomi community. Trial Ct. Op., 7/19/21, at 10-11.[6]

Mr. Rosado defended against the Associations' action by asserting that Covenant 14 is unconscionable and against public policy. He also presented evidence that he has fully complied with the requirements of SORNA and his parole and has committed no offenses since his release from prison in 2018.

On July 19, 2021, the Trial Court issued its decision, declaring Covenant 14 void as against public policy and denying the Associations' request for injunctive relief. The Associations timely filed a Post-Trial Motion, seeking a new trial on the ground that the Trial Court's decision was contrary to law and against the weight of the evidence.

On September 14, 2021, the Trial Court denied the Post-Trial Motion. In its Opinion, the Trial Court relied extensively on the Pennsylvania Supreme Court's decision in *Fross v. County of Allegheny*, 20 A.3d 1193 (Pa. 2011), which held that an Allegheny County ordinance that broadly excluded sex offenders from residing

---

[6] The community manager testified that "[t]he community pool is 1,500 feet from [Mr.] Rosado['s] property and the tennis court is 500 feet away." Trial Ct. Op., 7/19/21, at 10-11. She also testified:

> When Mr. Rosado did not move after Covenant 14 was adopted, Lake Naomi . . . publicized his on[]line Megan's Law registration to members of the community, and closed a shuttle bus stop for a children's summer camp near his property, picking up children in that area at their driveways instead.

*Id.* at 11.

5

in county population centers was preempted by the Sentencing Code, 42 Pa. C.S. §§ 9701-81, and the Prisons and Parole Code (Parole Code), 61 Pa. C.S. §§ 101-7301. While recognizing that the present case does not involve a municipal ordinance or the conflict preemption doctrine, the Trial Court nonetheless reasoned that "the *Fross* decision recognized *Pennsylvania's public policy to reduce recidivism among sex offenders and to improve public safety through the parole scheme established by the General Assembly*." Trial Ct. Op., 9/14/21, at 3 (emphasis added).

The Trial Court also found that Covenant 14, which amended Pocono Pines' Declaration, "is a contract that has been imposed by [Pocono Pines] on all . . . lot owners" and that "the court may refuse to enforce a contract that interferes with public policy." *Id.* at 4. The Trial Court explained:

> [The Associations] . . . attempt[] to distinguish the *Fross* decision by arguing that [Covenant 14] supports the predominate public policy [of] the protection of children, citing a passage from *Pennsylvania State System of Higher Education [PASSHE], Lock Haven University v. Association of Pennsylvania State College and University Faculties*, 193 A.3d 486, 499 (Pa.[]Cmwlth.[]2018) ("We agree with PASSHE that a well-defined and dominant public policy exists in Pennsylvania in favor of protecting children from child abuse, including abuse of a sexual nature.")[.] However, *the Fross decision did support that dominant public policy. The Supreme Court found that the best way to protect children and society was to allow the safeguards built into Megan's Law [now SORNA] to be employed.*
>
> What [the Associations] attempt[] to do is to protect the children in their community; but a banishment from Lake Naomi merely moves the offender somewhere else, perhaps closer to some other Pennsylvania family with children, despite the attempts of the [P]arole [B]oard to comply with the goals of Megan's Law, now SORNA . . . , for the protection of all Pennsylvania residents. Most Pennsylvania communities are "child-centered[]"[;] Lake Naomi is not unique in that regard. [The Associations'] expert testified that ten percent of Pennsylvania housing is in community associations. *Finding that these*

*associations are free to remove sex offenders would have a similar deleterious effect on the statewide approach to sex offenders that concerned the Fross [C]ourt.*

*Id.* at 5-6 (emphasis added).

The Trial Court also rejected the Associations' assertion that Mr. Rosado's challenge to Covenant 14 was barred by the one-year statute of limitations in Section 5219(b) of the UPCA, 68 Pa. C.S. § 5219(b).[7] The Trial Court observed that "[i]f [Covenant 14] did not violate public policy, Section 5219(b) [of the UPCA] would be dispositive here." *Id.* at 8. However, the Trial Court concluded that, regardless of the statute of limitations, "a court may not enforce a contract that is contrary to public policy[.]" *Id.* (citing *Rounick v. Neducsin*, 231 A.3d 994, 1000 n.6 (Pa. Super. 2020) ("*[T]he issue of the legality of a contract can never be waived* based upon the principle that the courts of this Commonwealth will not be used to enforce contracts that are illegal pursuant to a statute or that violate public policy.") (emphasis added)).

Ultimately, the Trial Court held that the "Sentencing Code, the Parole Code[,] and the *Fross* decision have identified Pennsylvania's public policy on the reintegration of sex offenders in Pennsylvania. Covenant 14 is a contract between [Pocono Pines] and its members that runs afoul of that policy." *Id.* at 10. Therefore, the Trial Court concluded that the Associations were not entitled to a new trial and denied the Post-Trial Motion.

The Associations timely appealed to this Court. In its Pa.R.A.P. 1925(a) Statement, the Trial Court adopted the reasoning of its prior decisions and reiterated its holding as follows:

---

[7] Section 5219(b) of the UPCA provides: "No action to challenge the validity of an amendment adopted by the association under this section may be brought more than one year after the amendment is recorded." 68 Pa. C.S. § 5219(b).

The *Fross* decision was based upon the preemption doctrine and did not address a restrictive covenant adopted by a community association. However, *the Supreme Court's ruling established a public policy that municipalities could not banish sex offenders because of the state[]wide legislative scheme to address sex offenders found in Megan's Law and now SORNA.*

Lake Naomi's expert testified in this case that ten percent of Pennsylvania residents reside in a planned community. The question here is whether the[ Associations] are permitted to do by contract what no municipality may do under *Fross*. *My ruling is that Fross and SORNA established a public policy that regulation of sex offenders, including their residences, is controlled by state statute, not by ordinances and not by restrictive covenants.*

Lake Naomi argues that it should receive special consideration because it is uniquely based on children[-] and family-oriented programs. Almost every community in our Commonwealth is protective of its families and children. If Lake Naomi is permitted to expel Mr. Rosado, he will have to relocate. *Lake Naomi will have excluded a known sex offender whose residence was approved by the . . . Parole Board in accordance with SORNA, and another community will then be required to accommodate [Mr. Rosado].*

Trial Ct. 1925(a) Stmt., 11/18/21, at 3-4 (emphasis added).[8]

## **Analysis**

On appeal, the Associations assert that the Trial Court erred in invalidating Covenant 14 on public policy grounds because neither *Fross* nor any other precedent

---

[8] Generally, this Court's review "'of a court of common pleas sitting in equity is severely restricted. . . . We will not reverse if apparently reasonable grounds exist for the relief ordered and no erroneous or inapplicable rules of law were relied on.'" *Eagleview Corp. Ctr. Ass'n v. Citadel Fed. Credit Union*, 150 A.3d 1024, 1028 n.2 (Pa. Cmwlth. 2016) (citation omitted). However, where the issue on appeal is purely a question of law, even in an appeal from a trial court sitting in equity, our standard of review is *de novo* and our scope of review is plenary. *See Hess v. Gebhard & Co.*, 808 A.2d 912, 920 (Pa. 2002) (applying plenary review to a question of law in an equity action); *Com. v. Kelley*, 801 A.2d 551, 554 (Pa. 2002) (stating that where an "appeal raises a question of law, our scope of review is plenary").

establishes a statewide public policy that prohibits a private, planned community from imposing a residency restriction on lifetime registered sex offenders. The Associations also assert that Mr. Rosado's claim is barred by the statute of limitations in Section 5219(b) of the UPCA because he raised it more than one year after Covenant 14 was recorded.

## 1. The *Fross* Decision

We begin our analysis with a review of the Supreme Court's decision in *Fross*, which was germane to the Trial Court's ruling and is the primary focus of the parties' arguments on appeal.

In *Fross*, a group of registered sex offenders challenged the legality of an Allegheny County ordinance that prohibited registered sex offenders from living within 2,500 feet of a child care facility, community center, public park, recreational facility, or school. 20 A.3d at 1197-98. The ordinance, in effect, prohibited sex offenders from living in most of the habitable and developed areas of Allegheny County. The sex offenders argued that the ordinance was preempted by the Sentencing and Parole Codes. *Id.* at 1198. In response, the County argued that the Parole Code and its accompanying regulations did not trump the well-established right of counties and municipalities to adopt local laws to protect the health, safety, and welfare of their residents. *Id.* at 1200. Thus, the County argued that the ordinance was a mere supplement to existing statutes and a valid exercise of the County's legislative power. *Id.*[9]

---

[9] *Fross* originated in federal district court, which held that the Allegheny County ordinance at issue was preempted by state law and entered summary judgment in favor of the sex offenders who challenged the ordinance. Allegheny County appealed, and the Third Circuit certified the case for appellate review by the Pennsylvania Supreme Court. *See Fross*, 20 A.3d at 1194-95.

The Supreme Court disagreed with the County, concluding that the ordinance interfered with the intent of the General Assembly in adopting Megan's Law and the Sentencing and Parole Codes and was, therefore, invalid under the conflict preemption doctrine. *Id.* at 1195. The Supreme Court first recognized that the General Assembly expressly listed among its purposes for adopting the Sentencing and Parole Codes the rehabilitation, reintegration, and diversion from prison of appropriate offenders. *Id.* at 1203. The General Assembly also determined that registered sex offenders, as a class, are eligible for parole and may benefit from those Commonwealth policies. *Id.* at 1204. The *Fross* Court observed that the primary means of implementing those policies is to offer familiar and stable environments to released sex offenders, like other convicted offenders, by promoting family and community ties and providing access to employment, counseling, and supervision. *Id.* The Supreme Court determined that the Allegheny County ordinance "effectively subvert[ed]" these goals. *Id.*

The Supreme Court also concluded that the ordinance failed to consider the General Assembly's policy determination to facilitate the diversion of offenders from prison and the Commonwealth's interest in the timely and effective administration of probation and parole as expressed in the Sentencing and Parole Codes. *Id.* at 1205. The County's residency restriction limited the options available to sentencing courts and the Parole Board in designing adequate reintegration plans for sex offenders who are released from prison. *Id.* The Supreme Court explained:

> [W]e are persuaded by the [sex offenders'] arguments that [Allegheny] County's [o]rdinance interferes with the goal of Megan's Law to reduce recidivism among sex offenders and improve public safety. Isolating all sex offenders from their communities, support systems, employment, and treatment is an approach contrary to that of the General Assembly, which requires individually tailored assessments

10

and assistance with rehabilitation and reintegration for appropriate offenders. The [o]rdinance chooses the importance of residency over all other considerations expressly incorporated into the probation and parole scheme by the General Assembly. And, finally, it is not hard to imagine the effect on the statewide legislative scheme if all counties were to adopt similar residency restrictions. The statewide scheme would be eviscerated.

*Id.* at 1207. Therefore, the Supreme Court held that the Allegheny County "[o]rdinance *impede[d] the accomplishment of the full objectives of the General Assembly, as expressed in the Sentencing and Parole Codes, and [was], therefore, invalid* pursuant to [the] conflict preemption doctrine." *Id.* at 1195 (emphasis added).

With these principles in mind, we now turn to the parties' public policy arguments relating to Covenant 14.

## 2. Public Policy

A contract can be voided on public policy grounds only if it violates a dominant public policy established by statute or other legal precedent. *Williams v. GEICO Gov't Emps. Ins. Co.*, 32 A.3d 1195, 1200 (Pa. 2011). Our Supreme Court has explained:

When considering whether a contract violates public policy, we are mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract. Rather,

*[p]ublic policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest.* As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy[.] . . . *Only dominant public policy would justify such action.* In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of

11

> violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. . . .

*Safe Auto Ins. Co. v. Oriental-Guillermo*, 214 A.3d 1257, 1262 (Pa. 2019) (citation omitted) (emphasis added); *see also Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 932 (Pa. 2021) ("'[A]voidance of contract terms on public policy grounds requires a showing of *overriding public policy from legal precedents, governmental practice, or obvious ethical or moral standards*.'") (citation omitted) (emphasis added).

First, the Associations assert that the Trial Court erred in relying on *Fross* to invalidate Covenant 14. The Associations point out that *Fross* involved an action by a county government, not a private community such as Lake Naomi. According to the Associations, *Fross* did not establish a statewide public policy prohibiting a private, planned community from imposing a residency restriction on lifetime registered sex offenders. The Associations also contend that neither the General Assembly nor Pennsylvania courts have established a public policy that prohibits a private, planned community from imposing a residency restriction on lifetime registered sex offenders. We disagree.

We conclude that the Trial Court correctly applied the Supreme Court's reasoning in *Fross*. Although *Fross* involved a county ordinance and not a restrictive covenant by a private community, the Supreme Court's ruling clearly established a public policy that local counties and municipalities cannot impose sex offender residency restrictions due to Pennsylvania's statewide legislative scheme governing the release of sex offenders, manifested in SORNA and the Sentencing and Parole Codes. If local counties and municipalities must adhere to these statewide mandates, so must private residential communities. A private community

12

may not impose more restrictive standards on where released sex offenders may live than county and municipal governments.

More recently, in *TWL Realty, LLC v. West Hanover Township Zoning Hearing Board*, 132 A.3d 533 (Pa. Cmwlth. 2016), this Court applied *Fross* to a case involving a township zoning ordinance that permitted only "nonviolent criminals" and "nonviolent crime detainees" to reside at privately owned community work release facilities. The township zoning officer issued a violation notice to a private work release facility where two registered sex offenders resided. *Id.* at 534-35. The notice stated that because the offenders had committed Tier III sex offenses, the township considered them to be "violent" offenders, so they were precluded from living at the facility under the ordinance. *Id.* at 535. The facility appealed to the zoning hearing board, which upheld the ordinance. *Id.* The trial court reversed the zoning hearing board's decision, concluding that the ordinance was preempted by the Sentencing and Parole Codes pursuant to *Fross*. *Id.*

The zoning hearing board appealed to this Court, arguing that the ordinance is not preempted by state law because, unlike *Fross*, there was no evidence demonstrating that the full purposes and objectives of the Sentencing and Parole Codes were obstructed by the ordinance. *Id.* at 537. The zoning hearing board also argued that the ordinance supported the Parole Board's goals and the township's legitimate concerns for the health, safety, morals, and general welfare of its residents. *Id.*

Relying extensively on *Fross*, this Court agreed with the trial court that the ordinance restricting which offenders may be housed in a private work release facility was preempted by the Sentencing and Parole Codes. *Id.* at 537-40. We concluded as follows:

13

*It is the purview of the sentencing courts and the Parole Board to determine which offenders are appropriate for community work-release programs.* The Pennsylvania Commission on Sentencing was charged with adopting guidelines that the Parole Board must consider when paroling an offender. Section 9721(b) of the Sentencing Code[, 42 Pa. C.S. § 9721(b),] charges the sentencing court with balancing the protection of the public with the rehabilitative needs of the offender. Section 6137(a)(1) of the Parole Code[, 61 Pa. C.S. § 6137(a)(1),] requires the Parole Board, when determining whether to parole an offender, to balance the best interests of the inmate with the need to avoid injury to the Commonwealth's interests, should the offender be paroled. Section 6137(g)(4)(iv) of the Parole Code[, 61 Pa. C.S. § 6137(g)(4)(iv),] specifically provides that the Parole Board may parole an offender only when "[t]here is no reasonable indication that the inmate poses a risk to public safety." Additionally, Section 6102(1) of the Parole Code[, 61 Pa. C.S. § 6201(1),] states that the Parole Code provides several benefits to society including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.

Taken together, the Sentencing and Parole Codes demonstrate that when the Commonwealth places an offender in a particular work-release program, the Commonwealth has determined that the offender's placement is consistent with both the public's safety and the needs of the offender to reintegrate into society. *The [o]rdinance's ban upon the housing of offenders with violent criminal histories is in conflict with the Commonwealth's determination that an offender is suitable for placement in the work-release facility; a determination that includes a conclusion that public safety would not be jeopardized by the offender. If the [o]rdinance is allowed to stand, other municipalities will be able to enact similar ordinances that contain more restrictive standards than the Sentencing and Parole Codes, thus jeopardizing the Commonwealth's parole scheme as embodied by the Sentencing and Parole Codes.*

*Id.* at 539-40 (internal citations and footnote omitted) (emphasis added).

Applying the reasoning of *Fross* and *TWL* to the facts of this case, we conclude that SORNA and the Sentencing and Parole Codes establish a public policy

14

that the regulation of released sex offenders is controlled by state law and may not be controlled by local ordinances or restrictive covenants. As this Court recognized in *TWL*, the Parole Board is charged with balancing public safety with the rehabilitation and reintegration of released sex offenders. Covenant 14 effectively restricts the Parole Board's ability to release a sex offender to his own residence, even after the Parole Board has determined that the offender's reentry plan is adequate and there is no reasonable indication that he poses a risk to public safety. Such a restriction interferes with the statewide statutory schemes that have been created to achieve a balance between public safety and rehabilitation. *See, e.g.*, 42 Pa. C.S. § 9721(b) (the trial court must consider the rehabilitative needs of the defendant in determining a sentence); *id.* § 9754(c) (the trial court must impose conditions of probation that assist the defendant in leading a law-abiding life); 61 Pa. C.S. § 6131(a)(14) (the Parole Board has a duty "[t]o coordinate the reentry of offenders into the community using evidence-based practices that are effective in reducing recidivism"); *id.* § 6102(2) ("[T]he [Parole B]oard and any other paroling entity shall first and foremost seek to protect the safety of the public."). Consequently, once a sentencing court or the Parole Board has determined that a home is an appropriate residence for a released sex offender, a private community may not disregard that determination by enforcing its own restrictive covenant.

We also reject the Associations' reliance on cases from other jurisdictions that have upheld sex offender residency restrictions, as we are neither bound by nor persuaded by those cases. *See* Ass'ns' Br. at 35-37 (collecting cases from other states). The cited cases involved sex offender residency restrictions imposed by public governments, not by private residential communities. In any event, as discussed above, the Supreme Court's decision in *Fross* – which *is* binding on this

15

Court – plainly holds that county and municipal governments in Pennsylvania may not impose sex offender residency restrictions that conflict with those established by state statutes.

We conclude that the *Fross* holding applies equally to privately governed communities, because they are no less bound by public policy than county and municipal governments. Indeed, Section 5108 of the UPCA states:

> *The principles of law and equity, including* the law of corporations and unincorporated associations, the law of real property and the law relative to capacity to contract, principal and agent, eminent domain, estoppel, fraud, misrepresentation, duress, coercion, mistake, receivership, substantial performance, *or other validating or invalidating cause supplement the provisions of this subpart*, except to the extent inconsistent with this subpart.

68 Pa. C.S. § 5108 (emphasis added). This provision indicates that planned communities governed by the UPCA, such as Pocono Pines, are required to comply with other applicable laws and legal precedent. Thus, pursuant to our Supreme Court's decision in *Fross*, we conclude that a private, planned community may not adopt a restrictive covenant that conflicts with state statutes governing where a released sex offender may live. In other words, Covenant 14, like the *Fross* ordinance, "stands as an obstacle to accomplishing the full purposes [and] objectives of the General Assembly" and is, therefore, against public policy. *Fross*, 20 A.3d at 1207.

Next, the Associations assert that the Trial Court failed to properly balance their interest in protecting their community from sexual predators against a convicted sex offender's interest in residing in Lake Naomi. The Associations argue that Lake Naomi is a child-centered community, and they have a responsibility to provide a safe and secure environment for their residents. The Associations also

argue that Covenant 14 is consistent with the legislative finding, articulated in SORNA, that protecting the public from sexual predators is a "paramount" interest. *See* 42 Pa. C.S. § 9799.11(4) ("Sexual offenders pose a high risk of committing additional sexual offenses and *protection of the public from this type of offender is a paramount governmental interest*.") (emphasis added). Thus, the Associations contend that their need to protect the safety and welfare of their residents outweighs Mr. Rosado's interest in living in his Lake Naomi home.

A trial court sitting in equity must balance the parties' competing rights and interests to achieve a fair and just result. *See E. Hempfield Twp. v. Brubaker*, 828 A.2d 1184, 1188 (Pa. Cmwlth. 2003) (recognizing that "a court of equity enjoys broad discretion in fashioning remedies which balance the interests of affected parties"). That is precisely what the Trial Court did in this case. While a private community has a legitimate interest in providing a safe living environment for its residents, the Commonwealth's legislative measures governing the release of convicted sex offenders were specifically designed for the protection of the public. *See, e.g.*, 42 Pa. C.S. § 9799.51(b)(1) (in enacting SORNA, it was the General Assembly's intent to *"[p]rotect the safety and general welfare of the people of this Commonwealth* by providing for registration, community notification and access to information regarding sexually violent predators and offenders *who are about to be released from custody and will live in or near their neighborhood[s]*") (emphasis added); *id.* § 9799.51(a)(1) ("If the public is provided adequate notice and information about sexually violent predators and offenders . . . , *the community can develop constructive plans to prepare itself for the release of sexually violent predators and offenders*," including "meet[ing] with law enforcement to prepare and obtain information about the rights and responsibilities of the community and to

17

provide education and counseling to their children") (emphasis added); 61 Pa. C.S. § 6102(1) (recognizing that the parole system provides "adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society[,] and the diversion of appropriate offenders from prison"). As the *Fross* Court noted, in enacting these measures, the General Assembly made a determination that sex offenders, as a class, are eligible for parole and the best way to offer parole is to provide released offenders with familiar and stable environments that promote family and community ties and provide access to employment, counseling, and supervision. *Fross*, 20 A.3d at 1204. For this reason, "although acknowledging the high risk of recidivism among sex offenders, *the General Assembly has generally rejected the option of simply excluding released offenders from entire communities as the primary or even preferable means of protecting the public*." *Id.* at 1205 (citing 42 Pa. C.S. § 9791(a)(2) and (b)) (emphasis added).

The Associations further argue that, unlike the ordinance in *Fross*, Covenant 14 does not limit Mr. Rosado's access to family, employment, counseling, public transportation, or support services conducive to his rehabilitation, because he can simply move to another community that does not have a sex offender residency restriction. According to the Associations, the evidence shows that Mr. Rosado has other housing opportunities in the Pocono Mountain area, as well as in Florida and New York where he also owns homes. However, the fact that Mr. Rosado owns other homes or can choose to live in another neighborhood is irrelevant. Mr. Rosado has owned his Lake Naomi home for 24 years, and the Parole Board approved his release to that home in 2018. Since he returned to Lake Naomi, Mr. Rosado has complied with SORNA's registration, supervision, and counseling requirements, has complied with the Parole Board's conditions, and has committed no further sex

18

offenses. By attempting to use Covenant 14 to banish Mr. Rosado from his lawfully owned home, the Associations are depriving him of his fundamental right to possess and protect his property. *See* Pa. Const. art. I, § 1 ("All men are born equally free and independent, and have certain *inherent and indefeasible rights,* among which are those of enjoying and defending life and liberty, of *acquiring, possessing and protecting property* and reputation, and of pursuing their own happiness.") (emphasis added). The Associations have not demonstrated that Covenant 14 makes the Lake Naomi community any safer than the General Assembly's extensive legislative enactments regulating the rehabilitation and reintegration of sex offenders.

We conclude that *Fross*, SORNA, and the Sentencing and Parole Codes establish a statewide public policy that the regulation of released sex offenders, including where they may live, is controlled by state law. Covenant 14 violates that public policy by unlawfully precluding a registered Tier III sex offender from living in his own Parole Board-approved home. Accordingly, we conclude that the Trial Court properly declared Covenant 14 void as against public policy.

### 3. Statute of Limitations

Finally, the Associations assert that the Trial Court erred in permitting Mr. Rosado to raise an untimely challenge to the validity of Covenant 14. Section 5219(b) of the UPCA provides that "[n]o action to challenge the *validity of an amendment* adopted by the association . . . *may be brought more than one year after the amendment is recorded*." 68 Pa. C.S. § 5219(b) (emphasis added). Here, Covenant 14 was recorded in 2016, and Mr. Rosado did not assert his claim that Covenant 14 violates public policy until 2019. The Associations point out that before Pocono Pines' adoption of the amendment in 2016, notice was sent to all unit

owners, including Mr. Rosado, in accordance with Section 5219(a) of the UPCA, and 71% of unit owners voted in favor of Covenant 14. The Associations further assert that Mr. Rosado admitted that he was aware of Pocono Pines' consideration of the sex offender residency restriction as early as 2014. *See* R.R. at 687a-88a. Consequently, they contend that Mr. Rosado should have asserted a timely challenge to Covenant 14 within one year after its recording (i.e., by May 11, 2017), as required by Section 5219(b) of the UPCA.[10] We disagree.

We conclude that the UPCA's statute of limitations does not preclude Mr. Rosado from defending against an action brought by the Associations beyond the one-year limitations period, because the plain language of Section 5219(b) applies only to the *filing of an action*. *See* 68 Pa. C.S. § 5219(b) ("*No action* to challenge the validity of an amendment . . . *may be brought* more than one year after the amendment is recorded.") (emphasis added). Our Supreme Court has recognized that a statute of limitations must be strictly construed against a petitioner seeking to pursue a stale claim against a respondent, not against a respondent raising defenses to the petitioner's claim. *See Morrison Informatics, Inc. v. Members First Fed. Credit Union*, 139 A.3d 1241, 1248 n.7 (Pa. 2016) ("[T]his Court has treated statutes of limitations as warranting strict construction, given that their purpose is *to prevent stale claims which might prejudice the defense*."); *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc.*, 842 A.2d 334, 346 (Pa. 2004) ("The purpose of . . . limitation periods is '*to expedite litigation and thus discourage delay and the presentation of stale claims which may greatly prejudice the defense* of such claims.' In light of the important purpose served by limitations periods, this Court has held that statutes of limitation are to be *strictly construed*.") (internal citation omitted)

---

[10] Mr. Rosado was apparently incarcerated when Covenant 14 was adopted in 2016, since he was convicted in Pennsylvania in 2015 and was not released on parole until 2018.

(emphasis added).[11]  Because the Associations initiated this enforcement action against Mr. Rosado, we conclude that the one-year statute of limitations is inapplicable here.

## Conclusion

We hold that the Supreme Court's ruling in *Fross* established a dominant public policy that local counties and municipalities cannot impose sex offender residency restrictions due to Pennsylvania's statewide legislative scheme governing the release of convicted sex offenders.  We further hold that this public policy necessarily extends to private residential communities such as Lake Naomi.

The Associations contend that they should be allowed to banish Tier III sex offenders because of the child-centered nature of the Lake Naomi community.  However, as the Trial Court pointed out, most residential communities in Pennsylvania are child-centered or are near child-centered areas such as schools, churches, and community parks.  As the Trial Court cogently observed:

> Residents surrounding the Lake Naomi community, living in Tobyhanna Township or elsewhere in municipalities outside of planned communities[,] are unable to remove Tier [III] sex offenders as [the Associations] seek[] to do here.  They must abide by the Supreme Court's decision [in *Fross*] that the residences of sex offenders are regulated by Pennsylvania statutes governing sentencing, probation[,] and parole.  Lake Naomi's solution to its problem of a resident sex offender is to force him to move elsewhere.  All of the dangers complained of by the Lake Naomi residents will then be thrust upon other residents of our society, perhaps just down the road from them,

---

[11] In support of their statute of limitations claim, the Associations rely on two appellate decisions from other jurisdictions: *Bilanko v. Barclay Court Owners Association*, 375 P.3d 591 (Wash. 2016), and *Stadnicky v. Southpark Terrace Homeowners Association, Inc.*, 939 P.2d 403 (Alaska 1997).  Aside from the fact that this Court is not bound by case law from other jurisdictions, those cases are factually distinguishable.  *Bilanko* did not involve a homeowner's defense to an enforcement action brought by an association, and *Stadnicky* did not involve the application of a statutory limitations period.

21

who don't live in a private community. Additionally, parole officers would not be able to approve Mr. Rosado's residence in a home he has owned for many years that is compliant with [SORNA].

Trial Ct. Op., 7/19/21, at 14-15.

While the residents of Lake Naomi want to preclude convicted sex offenders from living in their community, we cannot allow the Associations to enforce a residency restriction that, in practice, contravenes the goals and purposes of SORNA and the Sentencing and Parole Codes. As the Trial Court noted, the Supreme Court in *Fross* "found that the best way to protect children and society was to allow the safeguards built into [SORNA] to be employed." Trial Ct. Op., 9/14/21, at 5; *see also TWL*, 132 A.3d at 540 (recognizing that the Parole Board's determination that a facility is suitable for a released offender "includes a conclusion that public safety would not be jeopardized by the offender"). Because the Supreme Court has determined that those safeguards are sufficient to protect the residents of the Lake Naomi community and the public at large, we affirm the Trial Court's Order.

_____
ELLEN CEISLER, Judge

Judge Wallace did not participate in the decision of this case.

22

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Lake Naomi Club, Inc. and Pocono Pines Community Association, Inc., Appellants | : : : : | |
| v. | : : | No. 1164 C.D. 2021 |
| Eric Rosado and Alice Quinones | : | |

## **O R D E R**

AND NOW, this 28th day of October, 2022, the September 14, 2021 Order of the Court of Common Pleas of Monroe County is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge